NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0108n.06

No. 18-3242

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SUSAN BOGGS, FOUAD RACHID, NICOLE )
RACHID, FOUAD, INC., )
           )
         Petitioners, )
           )
v. )
           )
FEDERAL AVIATION ADMINISTRATION )
(FAA), )
           )
         Respondent. )

**FILED**
Mar 07, 2019
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW
FROM THE FEDERAL
AVIATION
ADMINISTRATION

Before: BATCHELDER, SUTTON, DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** The Boggs/Rachid family has long attempted to force the City of Cleveland ("City") to purchase their property in Olmsted Falls based on allegations that the Cleveland Hopkins International Airport ("Airport") has rendered it worthless. The latest installment is a complaint they filed with the Federal Aviation Administration, pursuant to 14 C.F.R. § 16, claiming that the City violated assurances it made to the FAA regarding the Airport. Two specific assurances lie at the heart of the administrative claim: that the City would hold good title to all Airport property, and that the City would mitigate all airspace hazards. The family argues that when the City extended the Airport's runways, the Airport's landing area encroached onto the family's property, and the pine trees on the family home became airspace hazards. The City countered that the maps the family provided demonstrated there was no crossover of the property lines, and that the FAA had previously determined that the pine trees were not hazardous. After considering the evidence, the FAA

granted summary judgment in favor of the City. The family now appeals, arguing that the FAA misapplied its own regulations and did not have substantial evidence to support its findings. We disagree. The law does not support the family's attempt to expand what constitutes "airport property" to cover their own home. Moreover, the family was not in a position to challenge the FAA's determination of airspace hazards through the type of administrative complaint they filed. For those reasons, we **AFFIRM** the agency decision.

## BACKGROUND

**The Parties.** Petitioners Susan Boggs, her husband Fouad Rachid, and their daughter Nicole Rachid live in a home in Olmsted Township, Ohio, located at 24505 Barrett Road ("Home"). Mr. Fouad and Ms. Boggs both own and control Fouad, Inc., an Ohio corporation, which in turn owns the Home. The City owns and operates the Airport. Due to an expansion of the Airport, the edge of the Property now sits 3,473 feet away from Runway 6L24R.

**Litigation History.** Since 2002, Petitioners have filed several complaints against various governmental entities regarding the Airport's effect on the value of the Home. The first complaint was against the City in state court in 2002. The state court dismissed the lawsuit for lack of standing. *See Boggs v. City of Cleveland*, 655 F.3d 516, 518 (6th Cir. 2011) (reciting litigation history). The second case was filed in 2008, also against the City and in state court. The City removed the case to the Northern District of Ohio. *Boggs v. City of Cleveland*, No. 1:08-cv-1253 (N.D. Ohio 2008). The parties stipulated to dismiss the case without prejudice and to toll the statute of limitations while Petitioners exhausted their administrative remedies.

In 2016, Petitioners initiated an administrative proceeding against the City pursuant to 14 C.F.R. § 16 ("Part 16"). That proceeding underlies the current appeal.[1] Under Part 16, any "person directly and substantially affected by any alleged noncompliance" with "assurances and other Federal obligations contained in grant-in-aid agreements" may file a complaint with the FAA. *Id.* at §§ 16.23(a), 16.1(a)(3). In other words, when an airport receives money from the FAA, the operator of the airport agrees to maintain the airport in a specific manner in exchange for that money, and if it fails to do those things it promised to do, an interested party can complain to the FAA for investigation and enforcement. Here, Petitioners filed their Part 16 complaint and alleged that the City had violated a host of assurances it had made to the FAA. Although they recite several assurances, their complaint depended only on two of them: Grant Assurance 4, which concerns the City's ownership of airport property; and Grant Assurance 20, which concerns the City's obligation to mitigate airport hazards, each set out as follows:

> Grant Assurance 4 Good Title. [The City], a public agency or the Federal Government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance, satisfactory to the Secretary, that Good title will be acquired. 49 USC 47105(d).

> Grant Assurance 20 Hazard Removal and Mitigation. [The City] will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

How did the City allegedly violate these assurances? Petitioners assert that it did so by extending the Airport's runways. That extension, argues Petitioners, placed the Home within the Airport's landing area and made some of the Home's tall pine trees obstruct navigable airspace.

---

[1]Petitioners also filed a complaint with the FAA in 2012, but that complaint was dismissed because Petitioners failed to follow the FAA's procedural rules.

As relief for allegedly violating these assurances, Petitioners requested the FAA to "conduct investigations and find non-compliance with the City's Grant Agreements."

**The Director's Order.** On January 24, 2017, and on review of the documents submitted by Petitioners and the City, the FAA's Director of Compliance ("Director") entered an order granting summary judgment to the City. Two conclusions were essential to the result: 1) that the Home did not sit in the Airport's landing area, and 2) that the FAA had already determined that the Home did not present a hazard to navigable airspace.

**Final Agency Order.** Petitioners appealed the Director's Order to the Associate Administrator of the FAA ("Associate Administrator"). They were met with the same result. In addition to affirming the Director, the Associate Administrator made two key findings: 1) that the airport property does not include airspace, and 2) that a Part 16 proceeding is an improper vehicle by which to challenge the FAA's determination of hazardous objects.[2]

The Associate Administrator affirmed the decision of the Director to dismiss Petitioners' Rule 16 complaint on the ground that no genuine issue of material fact existed warranting further proceedings. The Associate Administrator's decision was a final order of the FAA, 14 C.F.R. § 16.33(b), subject to judicial review, 49 U.S.C. § 46110(a). Petitioners filed a timely appeal with this Court. *See id.*

## II. ANALYSIS

### Standard of Review

We review the FAA's factual findings for substantial evidence. *Wilson Air Ctr. v. FAA*, 372 F.3d 807, 812-13 (6th Cir. 2004). "Substantial evidence is such relevant evidence as a

---

[2]The Director's and Associate Administrator's orders considered a number of additional complaints by Petitioners, but Petitioners do not challenge them in this appeal.

reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted). We review all questions of law de novo. *SPA Rental v. Somerset-Pulaski Cty. Airport*, 884 F.3d 600, 604 (6th Cir. 2018).

**Grant Assurance 4: Defining the "Landing Area" of the Airport**

Grant Assurance 4 requires the City to acquire title to "the landing area of the airport." The FAA reviewed maps that Petitioners provided of the Airport and found that the Airport's property lines do not intersect with the Home's property lines. Therefore, the FAA determined that the Airport was complying with Grant Assurance 4. Petitioners now argue that this finding was in error because the FAA applied the wrong definition of "landing area." According to them, the Airport's property actually extends into the air beyond the end of the runway, and that area extends onto the Home's property. We find this argument has no support in the law, and address each of Petitioners' specific points in support of it in kind.

First, Petitioners argue that the Airport Layout Plan and Exhibit A (both maps depicting airport property) show that the Home is situated within Airport property. The FAA reviewed those maps and determined that the Home was not part of the "landing area of the airport" because the outer boundaries of the Airport did not cross the outer boundaries of the Home. This Court has reviewed the maps Petitioners provided and cannot say that Petitioners have carried their burden to demonstrate that the Airport's property intersects with the Home.[3]

Next, Petitioners argue that the FAA's stated purpose for the ALP and Exhibit A shows that the Home should be part of the Airport's property. The FAA's Standard Operating Procedure

---

[3]None of the maps Petitioners provided legitimately indicate where the Home is located; instead, Petitioners rely in their briefing on describing where one would find the Home on the maps, which is insufficient to create a genuine issue of material fact. *See* 14 C.F.R. § 16.23(k) (the complainant carries the burden of proof).

explains that "[a]ll land described in a Project application and shown on an Exhibit A constitutes airport property federally obligated to comply with grant assurances."[4] Because the Home is depicted on Exhibit A, Petitioners conclude that it must be part of the Airport's property. This argument is erroneous for two reasons. First, the document Petitioners cite states that the airport property is comprised of the land that is *both* described in a Project application *and* shown on an Exhibit A. *Id.* Petitioners only point to the latter condition here (e.g., the Home is allegedly shown on Exhibit A, but is not described in a project application). Second, and more importantly, there is no authority for the proposition that the FAA's regulations regarding Airport Layout Plans can unilaterally redraw private property lines.

Third, Petitioners argue that the FAA used the wrong definition for "landing area" because it did not account for the airspace around the Airport necessary for airplanes to depart and land. Petitioners cite 49 U.S.C. § 40102(a)(28) as the controlling definition for the term "landing area," which provides that the "landing area" is, in pertinent part, "a place on land or water, including an airport or intermediate landing field, used or intended to be used, for the takeoff and landing of aircraft. . . ." Although this is the controlling definition for "landing area," nothing in it suggests that the airport property extends into the air. Petitioners' citation to 49 U.S.C. § 40102(a)(28) simply does not support their argument that the airport property extends into the adjacent airspace.

To move beyond that fact, Petitioners weave a somewhat tangled argument. First, they state that the FAA's Compliance Handbook explains that Airport Layout Plans must include all "Part 77 Surfaces" (this is in reference to 14 C.F.R. part 77, which sets forth FAA requirements regarding obstructions to air navigation). Second, they argue that 14 C.F.R. § 77.19 describes an

---

[4]Standard Operating Procedure 3.00 for FAA Review of Exhibit 'A' Airport Property Inventory Maps, at ii, available at https://www.faa.gov/airports/resources/sops/media/arp-SOP-300-Exhibit-A-Review.pdf.

approach surface (a "Part 77 Surface") as an imaginary plane (the geometric term, not the vehicle) that extends upwards and outwards from the end of a runway at a specific ratio, so that it captures the air in which arriving and departing airplanes must traverse. Connecting these two dots, Petitioners contend that the approach surface is part of the Airport's landing area (and, further, that the Home is situated within the approach surface and is thus situated within the Airport property). Petitioners' argument missed a dot—they've failed to connect the "approach surface" with the "landing area."[5] Although the FAA's regulations explain that an Airport Layout Plan must include the approach surface, Petitioners cite no authority explaining that the approach surface is (or should be) part of the Airport's property (or, landing area). Indeed, the controlling statutory definition of an "airport" is the "landing area used regularly by aircraft for receiving or discharging passengers or cargo," 49 U.S.C. § 40102(a)(9), and the controlling statutory definition of "landing area" includes "a place on land or water," *id.* at § 40102(a)(28), but, notably, not the air.

In their last attempt to explain why the air space outside the Airport should be considered airport property, Petitioners turn to the statutory definition of "navigable airspace." Congress defined navigable airspace as "airspace above the minimum altitudes of flight prescribed by regulations under this subpart and, including airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. § 40102(32). Petitioners take this definition and apply it as follows: "If the [Property] is part of the navigable airspace by federal law, which includes airspace needed for landing and taking off of aircraft…then the [Property] is in [the Airport]'s landing area, which means, by definition, that the [Property] is part of the Airport." Pet. Opening Br. at 22 (ellipses in

---

[5] Notably, it appears this argument might have succeeded under the Federal Aid Airport Program, which defined "land" to include "approach zones," but, as the Associate Administrator highlighted, the Airport's Grant Assurances are controlled instead by the Airport Improvement Program, which excludes airspace as part of the landing area. *See* 49 U.S.C. § 40102(a)(28)

original). This string of thought again misses a necessary step. Nowhere do Petitioners point to authority stating that the Airport must acquire good title to all navigable airspace surrounding it, or that the navigable airspace is part of the Airport's landing area. Nor could they, as the statutory definition of landing area describes an area of land and water, not air. 49 U.S.C. § 40102(a)(28).[6]

### Grant Assurance 20: Part 16 or Part 77 Proceeding

Grant Assurance 20 requires the City to mitigate all "existing airport hazards" "as is required to protect instrument and visual operations to the airport." The FAA made two findings concerning Petitioners' complaint about Grant Assurance 20: first, that a 2000 FAA study that reviewed possible hazards did not identify the Home as being a hazard; and second, that a Part 16 proceeding is not the appropriate venue to challenge the FAA's determination of what constitutes a hazard. Petitioners challenge both of these findings, but we find that the FAA's latter position is both correct and dispositive.

There is a specific procedure by which an interested party may dispute the FAA's determination that an object is not an obstruction to navigable airspace. That procedure is found in 14 C.F.R. § 77.37 (a "Part 77 proceeding"), which permits an individual to ask the FAA to reconsider its decision that a project is or is not a hazard. In their complaint, which was filed pursuant to Part 16, Petitioners do exactly what one would do in a Part 77 proceeding. They argue

---

[6]Petitioners also cite *Griggs v. Allegheny County*, 369 U.S. 84 (1962), for the proposition that the Supreme Court has found in favor of a landowner with similar facts. Petitioners Reply Br. at 7. In that case, a property owner filed a complaint in state court against the county pursuant to the Takings Clause of the Fifth Amendment. Clearly, *Griggs* is inapposite here. This is an administrative review of whether the City has complied with its Grant Assurances. *See* 14 CFR § 16.1(a) (describing the purpose of a Part 16 proceeding as ensuring that grant assurances are followed). Moreover, Petitioners did not make a claim under the Takings Clause in their Part 16 Complaint.

that the FAA has failed to identify a hazard based on the extension of the Airport.[7] The FAA correctly decided that Petitioners' Part 16 complaint was not the appropriate vehicle through which to challenge the FAA's determination as to whether the Airport extension created any hazards. Thus, the FAA also correctly dismissed Petitioners' claims as to Grant Assurance 20.

### Remaining Grant Assurances

The remainder of Petitioners' claims are dependent on a determination that the City violated Grant Assurances 4 or 20. Because Petitioners have failed to demonstrate that the FAA erred in concluding that the City breached Grant Assurances 4 or 20, the remainder of Petitioners' claims similarly fail.

### III. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the decision of the FAA.

---

[7]Part 16 explains that its provisions apply, amongst other things, to "[t]he assurances and other Federal obligations contained in grant-in-aid agreements issued under the Airport and Airway Improvement Act of 1982." 14 C.F.R. part 16.1(5). Based on the briefing before this Court, we must conclude that Part 16 was promulgated to ensure that the grant recipient—rather than the FAA—has abided by the grant assurances. This is so for one primary reason: on review of the grant assurances at issue in this case, the obligations extend only to the Airport. It appears as if the FAA has satisfied its end of the deal simply by providing the grant money. Petitioners have not provided any reason for this Court to find that their Part 16 proceeding was an appropriate measure through which to challenge the FAA's role in executing grant assurances.